1-076-11828 Michael Hall v. Cargill Incorporated Good morning. May it please the court, Dorian Britt on behalf of the Appellant Cross Appellee. This appeal, in this appeal, we contend that the District Court committed error when it ruled on the threshold issue of standing in this case, holding that New Vision Foods lacked standing to bring state law claims and patent law claims in this case because it had transferred the technology at issue to another company by the name of LGX. And we contend the District Court's decision in that regard was wrong for two things. In order for that transfer to happen, the transfer of the technology from New Vision Foods to LGX, two things had to have occurred, one of which is that adequate funding in the amount of $8.5 million had to have been provided for the startup of a facility out in Hinton, Oklahoma, to process a million pounds or a million tons of cocoa per year. That funding, we contend, was never fully provided. In fact, it was short in the neighborhood of about $350,000. And we contend that because that funding wasn't provided and was not adequate to fund the needs of the Hinton project. And the District Court found to the contrary, didn't it? He did, Your Honor, yes. And you say that finding was clearly erroneous and not supported by the record? Correct. He found that, apart from the fact that maybe the funding wasn't fully provided in the total dollar amount, he found that what was provided was, in We contend that is not the case, Judge, based on the testimony of Michael Schallner, who was the successor manager of LGX. When he came on the scene, he testified that the company was underfunded and, in fact, had been undercapitalized since its inception, which is clear testimony in our mind. But isn't that really a different issue as to whether they were undercapitalized since the inception? There were two conditions. One was a $300,000 contribution. Correct. And one was $8.1 million. Right. Under the initial operating agreement, it was $300,000, and the second operating agreement called for $8.1 million, neither of which were met. Well, the District Court found otherwise with respect to the $300,000. They noted there was a $250,000 loan and a $50,000 loan that totaled $300,000. Well, there's evidence in the record, Judge, that refutes that. There's some check stubs, some ledger documents that we can tend to show that that monetary amount wasn't, in fact, met, nor what was provided adequate to fund the project. And that's just one prong that was required in order for this trade. No, but whether it was adequate adequacy I don't think is really the issue. It's whether or not $300,000 was contributed under that requirement. Correct. And whether it was adequate or not, that's totally a separate issue. It is. I don't think that that's part of the agreement. The $300,000 requirement was part of the initial operating agreement that would have transferred the interest. We contend that $239,000 of that was only provided, which, again, is supported in the record by ledger statements and checks and things of that nature. So, therefore, that payment was never made. But the amendment agreement shows otherwise, doesn't it? It shows that you did receive the initial funding of $300,000. The enterprise has loaned $250,000 at LGX, which is evidenced by the promissory note, and the $50,000 that was loaned by Dowdy. Correct. So that's $300,000. Well, even if that funding did occur, we still contend that the $8.1 million under the amended operating agreement did not occur. What that would then evoke would be this failure to fund provision in that amended operating agreement that would then allow... But that's the second one, the big one, right? Correct. But that has sort of an out in it. It says $8.1 million, whatever it is, or such amount as is necessary to fund the thing, and apparently the district court said that they were about, what, 5% short of that in the funding? Something like that. And the district court said, well, that was substantially enough to fund it. And that's also, I take it, as a factual finding that you have to show is not supported by the record. It is, Your Honor. Again, the testimony that we have is from Michael Schallner, who was the manager. He said that they didn't have any cash and that they had been underfunded since the inception. So we contend, based on his testimony, that this project was not fully funded. And again, that's just one prong or one requirement that would have had to have been met to transfer these funds under the development and construction agreement for the actual Hinton facility. There was also a provision that said that the facility had to start up and begin operations in order for that transfer to have stayed in place. In other words, if it didn't start up and begin operations, then that failure to fund provision of the operating agreement would be evoked and the technology would be equally usable by all the members of LGX, which would include New Vision Foods. And the testimony clearly, in my mind, undisputed testimony, is that this facility was never, in fact, operational. Mike Mosher, who was kind of the hand... But again, you say it didn't operate or it didn't operate effectively and vigorously. The court said that the reason it didn't operate was not because it wasn't fully installed properly, which is something else. In other words, the court said to whatever extent this facility was not effectively operating, it wasn't the result of a lack of financing. It was because they didn't know how to operate it. That's correct, Judge. Even if that's true, though, if the Hinton Project facility did not begin operations and did not start up, that would still invoke that failure to fund provision. And the testimony in the record, especially of Mike Mosher, who was a hands-on kind of technical employee of New Vision Foods who was working out there tinkering with this equipment on a daily basis, has testified that in a plant that was designed to process a million pounds of cocoa every month with only five days of downtime, that the closest this plant ever got to that was 16% of that capacity. Now, even assuming for the sake of argument that we would agree with you on that, you then still have to demonstrate that the effect of this lack of adequate funding was to rescind the transfer of the technology. And the language seems to say not that it's rescinded of that provision, but that if the funding fails, the property, the technology, will be available to all members, which sounds as though they still keep it, but anyone can get it lost. That's correct, Judge. I mean, the language does say that if that failure to fund provision is applied, then the technology is usable by all the members, which would include New Vision Foods. And you interpret that as meaning that the original technology transfer has been rescinded? Correct, Your Honor. That seemed like a rather peculiar way to state it, if that's what they intended. One would have thought they would have said, if this isn't done, previously assigned technology is rescinded or returned to the previous owners. Well, I probably would have drafted that a little bit differently myself, Judge, but that was our understanding. That was Mr. Hall's understanding. Again, the purpose of it was to provide the technology to a company who would develop it and use it and make a commercial product with it. If that wasn't going to happen, then the technology should then be fair game for all those who invested their time and money and effort into it. So the fact that it reverts back to all the members, including New Vision Foods, would then give New Vision Foods standing weak in terms of You must be arguing that the district court, in addition to making these erroneous factual findings, has misinterpreted the agreement. That is correct, Your Honor. I think that was open to interpretation, and I think our reading of it is is now usable by New Vision Foods, and therefore they had standing to raise the claims they have, their state law and patent law claims. But, Mr. Brady, if I understand your argument, because of those two financing conditions and only those two conditions, the technology reverted back to the members. So if those two conditions are met, then there's no reversion back. Well, you have to read those two conditions in conjunction with the development and construction agreement, which evokes that failure to fund provision. So you actually have two requirements, which is the funding, and then if the facility does not start up operations, it's considered to have been a failure to fund, which then evokes those prior provisions, which says that the technology is therefore then usable by all the members of LGX. But the failure to fund is the basic condition that you're arguing on. Correct. The development and construction agreement ties into that failure to fund provision in the amended operating agreement. But there is a difference between whether it was operational and whether it was fully operational. Correct. In other words, it was fully operational. Right. It was fully operational, but it was not operating at capacity. Well, we contend it didn't even really get beyond in an operational state for months and months. This facility was processing basically test batches from various chocolate suppliers. Bloomer was one. Callebaut was another. And one batch may be good. One batch may be bad. To consider something operational, I would argue that it means that you get a consistent product over and over again, and that simply wasn't the case. Nor, as Don Hall testified, was there anybody out there to run it. They didn't have any clients. They weren't getting paid any large sums to produce on a commercial scale. And the most this facility ever produced in one year was about 3% of its operational capacity. And we just differ with the district court. All right. Do you want to say your rebuttal? Yes, please. Thank you. All right. I have one quick one. Any other questions? Mr. Britt. Mr. Britt, just one question. With respect to the audit report that was issued by the state of Minnesota, what needs to be done with that? Can we take judicial notice of that? We argued against it, Judge, but we'll waive that. Is it a public document? My understanding is it is, Judge. Mr. Best can probably talk to you more about that. Thank you. Mr. Best. Thank you, Your Honor, and may it please the Court. The Court's identified exactly the problem with Plaintiff's argument, which is that the initial $300,000 was provided. The amended operating agreement that Plaintiff signed states that it was provided, and they waived any argument that it wasn't, by virtue of the fact that they signed the amended agreement. With regard to the failure to fund provision, Section 7.8 of the amended agreement, first of all, the auditor's report, which came out after the district court's decision and of which we asked this Court to take judicial notice, clearly establishes on page 20 that within a month of signing the amended agreement, they got $8.9 million. And over the life of the company, they got $9.8 million. What are you asking us to take judicial notice of? The fact that there was a report of what was in it, or the correctness of the report? I have serious problems with our taking judicial notice of an auditor's report as establishing the facts set out in the report. I mean, when you're talking with dollars, that's a matter that's constantly being disputed. The auditor says one thing, and someone else comes in and says, the auditor is wrong. I mean, I would have no problem taking judicial notice if the auditor wrote a report. But I gather you want us to take judicial notice of the auditor's report as establishing the facts set out in the report. Your Honor, I believe that at the very least, the court needs to take judicial notice of the existence of the report and that it says what it says. We think that the case law establishes that, in fact, the court can take judicial notice of the correctness of the dollar figure set forth in the report. For example, in Blair v. City of Pomona, which is 223F3-1074, the Ninth Circuit took judicial notice of an independent commission report that did an investigation of the conduct of various city police departments in Los Angeles. But isn't it correct that normally judicial notice relates to matters that are not subject to dispute? And certainly the dollar amount set out in an auditor's report may be subject to dispute. I don't know, but I have a suspicion that your opponent would dispute the amount set forth in the auditor's report. And if it's subject to dispute, I don't see how we can take judicial notice of it. I mean, traditionally, judicial notice is taken of the fact that the 7th of April in 1922 was on a Tuesday. I mean, that's something you can take judicial notice of because there's no dispute about it. But if the question was how much someone earned from the practice of the profession in a particular year, and somebody says, well, here's a report showing this, and the fellow says, no, I earned a lot more than that, I don't see that we can take judicial notice of that as being established beyond dispute. Your Honor, I respectfully disagree based on the procedures and the process that the auditor stated he followed in the report in terms of following the money and auditing. And the report's very careful to note where there were inadequate records. But in order to prevail on this aspect of the case, you don't have to rely on that auditor's report, do you? Isn't it enough to show that there was substantial compliance with the dollar amount? Clearly, if the court declines to take judicial notice of the dollar figures set forth in the report, cargo is still entitled to prevail, and the district court's decision was correct. The district court didn't have the report available to it at the time it decided that the amount of funding that was provided and that they admit, that plaintiffs admit was provided, was, in the language of the failure to fund provision, reasonably sufficient to fund the company's operations. We know that that is the case because during the Philadelphia litigation, in earlier litigation, plaintiffs were saying and testified under oath that the plant was operational. At page 1718 of the appendix, they sent marketing literature out providing operating cost figures based on operations of the plant. So when it suited them to claim that the plant was operational and had been funded to the point where they could start it up and get reliable figures from it, they did so. Now, in this litigation, they're backing away from that, trying to create a factual issue. The district court properly considered Mr. Moser's testimony. Basically, didn't the district court find that the problem here was that although the plant was operational, it couldn't get the business it needed? I believe that's one of the basis for the district court's decision. The other basis is that plaintiff's description and determination of what the plant needed to do to be operational is a hope or an aspiration. And the fact that they started up and it wasn't as good as they thought it would be doesn't mean that it wasn't operational. The bigger problem by the business fell was not lack of money, but the location and the fact that they couldn't get customers. And finally, even if the amount of funding's inadequate and failure to fund provision did occur, the fact is that the language at some point doesn't give ownership rights, which are necessary for them to have standing, doesn't give it back to them. The language in Section 3.4 of the agreement clearly states that they transferred all their rights, which means ownership, to LGX. And even if the failure to fund provision applies, all they get back is a right to use. They get a non-exclusive license. That's not enough to give them standing. So we think that clearly the district court's decision with regard to the funding and their lack of standing to bring their state law claims and their patent claims was correct. As we discussed in our brief, there are additional reasons why the district court chose not to address why the judgment regarding the patent claims should be affirmed. If the court needs to consider those, we would ask that you do that. But the district court did not hold an evidentiary hearing. This was all done on summary judgment motions, right? Correct, Your Honor. So the findings, the factual findings, were all from documents? Correct. And isn't it on the basis of the judgment that the factual findings certainly were not in favor of the Hall plaintiffs? That's correct, Your Honor. The district court considered all the evidence, carefully stated the correct standard for summary judgment, drew all the inferences that it could in favor of plaintiffs who were the non-moving party, and determined that they lacked standing. We believe the district court's decision in that regard was correct and should be affirmed. And all the inferences were to be drawn in favor of the non-moving party? Correct. In spite of the findings of fact that were made by the court? The court considered all of the evidence, drew inferences from that evidence that favored the non-moving party, and still determined that no reasonable jury could find a plaintiff's favor. That's the proper summary judgment standard. With respect to the judicial notice of the audit report, wouldn't the audit report really be subject or the auditor would be subject to cross-examination as to the procedures used and the source of the information that was determined to be in the report? Conceivably, the auditor could be subject to cross-examination with regard to the methods used. I don't know that there's any particular immunity that would preclude that procedure, Your Honor. I honestly haven't looked into that. But with respect to that, then, do you really need the audit report to prevail? As I stated in response to Judge Friedman's question, I believe no. The audit report wasn't available to the district court at the time of the district court's ruling, and the district court's ruling is correct for the reasons I've articulated now and in our brief. Turning to our cross-appeal, we believe the district court erred when it determined that Cargill lacked standing to bring its claims for patent infringement against the plaintiffs. In the district court's ruling, it was premised on the alleged lack of standing based on a termination letter that Cargill received. Cargill disputed whether or not the licensor had power to terminate the agreement and whether that termination was proper. The licensor later acknowledged that that notice of termination was improper by signing an agreement that annulled the notice of termination. You also said it was non-exclusive in the sense that the licensor retained the right to sue. You didn't, if you didn't. The licensor retained a limited right to sue. With respect, Your Honor, I believe a reading of this court's case law about what is an adequate exclusive license to confer standing to sue doesn't require that the exclusive licensee be the only party that can sue. It only requires that there be no risk of multiple suit. And by its terms, the license agreement between the two parties clearly precludes or removes the risk of multiple suit by saying if Cargill sues, Mr. Franke cannot. And furthermore, the prior non-exclusive license to Hershey is a red herring because the difference between taking exclusive license subject to a prior license and taking assignment to an exclusive license is immaterial. So the existence of the Hershey agreement is, in our view, irrelevant to whether or not Cargill had standing to sue. All right. If there are no further questions, I'll save my rebuttal time. Okay. Mr. Graff. Brett. With respect to Cargill's counterclaim, as the court picked up on, under patent law, the only individuals or companies who can bring an infringement claim are, of course, the patentee, the assignee, or a licensee who holds all substantial rights to the technology. And one of those substantial rights is exclusivity. And Cargill, I think, has admitted in his correspondence he's had with Mr. Franke or his various companies or their attorneys that they are very worried about the fact that he had issued this license prior to Hershey governing the same technology. So it's our contention that, as the court noted, that this license to Cargill was not exclusive and therefore did not grant upon Cargill standing to sue for infringement in this case. And secondly, we think the district court was correct in finding that at the time that Mr. Michal did these various liquefied gas extraction tests on what we would contend would be a product that would not be covered by the Franke patents anyway, that Cargill's license wasn't even in effect, even if it was exclusive, that they had terminated it months before Mr. Hall performed his tests and it remained terminated throughout the time he did those tests. So the district court noted an equitable argument, which I think makes sense, which is that how can you hold somebody to a license that wasn't in place but is somehow then retroactively applied? It's just simply not fair to Mr. Hall in this case to say, well, we're going to reinstate this license, and by the way, you're now infringement of it, even though at the time we didn't have it. So we think for those reasons, Your Honors, that the district court was correct in denying Cargill's motion for summary judgment of the counterclaim. Thank you. Your Honor, in response to Mr. Britt's arguments regarding the counterclaim, first of all, this court's case law clearly establishes that the hallmark of an exclusive license withstanding the sue is the power to indulge infringement, and that's what Cargill has by virtue of its license,  by virtue of the fact that it's the sole party that can indulge infringement by granting sublicenses. Even if Mr. Franke were to choose to sue, Cargill could immunize the party by granting a sublicense. Furthermore, his public notice argument assumes something that is in fact almost never the case, which is that licenses of this nature are available to the public, and the public's entitled to rely on them. Licenses are almost always confidential, and the terms are not known. So whether or not there was a dispute and the license was, in Mr. Britt's view, reinstated is irrelevant. And finally, and most importantly, the license was not canceled and then reinstated. What happened here is no different than if Cargill had pursued arbitration and gotten an arbitrator's ruling that said the notice of termination was not properly made and therefore ineffective. Certainly, if Cargill had gone arbitration and gotten a ruling that said that, there would be no quote-unquote gap in Cargill's right to sue. Well, here, Mr. Franke, Cargill didn't have to go through arbitration because Mr. Franke recognized that his notice was invalid and annulled it. That's the meaning of the term annull that's used in the amended and restated agreement. The district court just improperly construed the amended and restated agreement and improperly denied Cargill standing to assert its counterclaims for patent infringement in this case. Are there no further questions? Thank you. Thank you. The case is submitted.